IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RYAN W. WILLIAMS, | * | |
| Petitioner, | * | |
| v. | * | Civil Action No. GLR-23-1182 |
| WARDEN CARLOS D. BIVENS, | * | |
| Respondent. | * | |
| | *** | |

**MEMORANDUM OPINION**

THIS MATTER is before the Court for consideration of self-represented Petitioner Ryan W. Williams' Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1). Respondent Warden Carlos D. Bivens filed a Limited Answer to the Petition asserting that the matter is time-barred. (ECF No. 6). The Court advised Williams of his right to respond to the Limited Answer and offer an explanation to excuse the untimely filing of his Petition (ECF No. 9), and Williams responded (ECF Nos. 10, 11, 13–16).[2] The Petition is thus ripe for disposition, and no hearing is necessary. See R. Govern. § 2254 Cases U.S. Dist. Ct. 8(a); 28 U.S.C. § 2254(e)(2); Local Rule 105.6 (D.Md. 2023); see also Fisher v. Lee, 215 F.3d 438, 455 (4th Cir. 2000) (noting that a petitioner is not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons set forth below, the Court will deny the Petition and decline to issue a certificate of appealability.

---

[2] Williams filed a "Motion for Court to File a Legal Memorandum in Support of Petition" (ECF No. 15), which the Court will grant. The Court considers Williams' additional filings as supplements to his response in opposition and considers each in resolving the Petition.

## I. BACKGROUND

### A. **Factual Background**

Williams was tried and convicted by a jury sitting in the Circuit Court for Charles County of the second-degree rape of a minor. (State R. at 17, ECF No. 7).[3] In an unreported opinion affirming Williams' conviction, the Maryland Appellate Court (formerly the Maryland Court of Special Appeals) described the facts adduced at trial as follows:

> At the time of trial, the complaining witness [V[4]] was eleven years old and in the fifth grade. In February 2012, she was a ten year-old girl with her own Facebook account, set up for her by her mother. [V.] identified Williams in court and testified that he initially contacted her on-line, after which they began sending messages to each other on Facebook, and, on April 9, 2012, she agreed to meet Williams for the first time.
>
> [V.] testified that Williams picked her up by car at the home of her grandmother, where she resided, and drove her to his house, which was a short distance away. At first, they talked on the porch, and later, they went upstairs to his bedroom. During trial, [V.] answered questions describing the room's interior, including its furnishings and colors of the walls, the bed comforter, as well as his underwear.
>
> [V.] testified that Williams removed her clothes, got a condom from a dresser drawer, and "stuck his private parts into mine," meaning his penis into her vagina. After this continued for "about 5 minutes," she told him to stop because it hurt, but he did not stop. She tried to get up, but he held her down. When Williams went to the bathroom, she put on her clothes, left the house and walked home. [V.] did not tell anyone in her family what had happened because she was scared she would get in trouble.
>
> About a month later, [V.] testified that her mother and

---

[3] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

[4] The victim is referred as V to protect her identity.

grandmother found out what had taken place, through her Facebook account. The State introduced records from Facebook showing several communications between the accounts registered to [V.] and to Williams. On the evening of April 9, 2012, the following e-mails were among those reflected in the Facebook records between [V.] and Williams:

[V.]: Did Dha Condom Break?? ...

[Williams]: no i didn't break why?

[Williams]: wat happen?

[V.]: My Tummy Hurts REALLY Bhad

[Williams]: did u want me to try and get u something? It didnt break tho

[V.]: Nah. But Thanks.. So Are We Lyk Fuckin Buddies Or SumShid

[Williams]: yea, we can be...

Approximately two weeks later, on April 25, 2012, [V.] and Williams exchanged another set of e-mails, which include the following:

[Williams]: havent seen u for a while. miss u

[V.]: I Kno.... Miss Yah Too

[Williams]: u not too busy tomorrow r u? Cause ima be home all day.

[V.]: Imma Be Home Lyk 2:30 and GrndMa Gets Off After 5:00 So Yhu Cud Come Over!

[Williams]: ok kool...

[V.]: KayyKayy!! What We Gonnah Do

[Williams]: we can hang out nd talk for a lil bit...

3

[V.]: We Said That Last Time And We FUCKED!!

[Williams]: tru...wat do u want to do?

[V.]'s mother, Melissa, testified that on May 11, 2012, she signed onto [V.]'s Facebook account where she noticed inappropriate sexual messages between her daughter and an older male. During trial, she identified Williams as the male whose name and photo appeared beside those sexual messages being exchanged with [V.]. When [V.] returned home from school on May 11th, Melissa confronted her. At first, [V.] told her that "somebody had grabbed her and threw her in the car and had sex with her," but then she told her mother the truth. Melissa took her daughter to the police station that day.

Melissa's mother, Doris, was the grandmother with whom [V.] lived. Doris testified that on May 11, 2012, at 6:07 p.m., she got a phone call from her sister, Patricia, asking her to come out to her front yard. When she did, Doris saw a man on his knees in front of her sister's car. The man ran over to Doris, got down on his hands and knees and told her that he was "begging for his life." Doris identified Williams as the man in her yard. Williams told her that he was nineteen years old and that he thought her granddaughter was sixteen years old. Doris testified that she told him to get off of her property. He was trembling and upset, and Doris thought he was going to start crying.

Patricia corroborated much of Doris' testimony. In court, she identified Williams and testified that he was "in a desperate state" when he approached her in Doris's front yard and said, "'I'm pleaing [sic] for my life,'" and "'I don't want to lose my job. . . . My government job, my good government job.'" He told her that he was nineteen years old, and that "my niece lied on Facebook that she was 16 years old." Williams's driving record and arrest card indicate that on April 9, 2012, he was twenty-seven years old.

Detective Corporal Kenneth Klezia of the Charles County Sheriff's Office testified that he interviewed [V.] for close to an hour at his office on May 11, 2012, during which she gave "multiple versions" of what had happened. At first, she gave what he thought was an embellished account of what had taken

4

>place, as children often do to avoid getting themselves into trouble. After about 20 minutes, she gave a second account of what had taken place. After completing the interview, Detective Klezia obtained a search warrant, and searched Williams's home on May 12, 2012. Photographs were taken of the bedroom which depicted blue-colored walls and bedding, as described by [V.], and condoms were recovered from a dresser drawer, where she said they had been on April 9, 2012. She also told the detective that Williams had worn blue underwear, and a pair of blue boxer shorts were recovered.

(State R. at 76–80) (footnotes omitted).

After a two-day jury trial, the jury convicted Williams of one count of rape (statutory) but could not reach a verdict on the other count of forcible rape. (State R. at 76). On January 29, 2013, Williams was sentenced to 20 years' imprisonment, all but 18 years suspended, with five years' probation. (Id.). Williams is also subject to lifetime registration as a Tier III sex offender. (Id.).

**B.     Procedural Background**

Williams filed a timely direct appeal asserting two claims: whether (1) the trial court improperly restricted cross-examination of State's witnesses; and (2) his sentence was "motivated by impermissible considerations." (State R. at 29). Williams' judgment of conviction was affirmed on May 14, 2014, with the court's mandate issuing on June 13, 2014. (Id. at 75–94). Williams filed a petition for writ of certiorari with the Supreme Court of Maryland (formerly the Court of Appeals of Maryland) on June 30, 2014. (Id. at 95). The court denied the petition on September 22, 2014. (Id. at 102).

Williams also filed a timely motion for reconsideration of his sentence under Maryland Rule 4-345(e). (Id. at 17–22). He requested a hearing on the motion, (id. at 22),

5

but the court, by way of marginal order, indicated it would take "no action," (id. at 21). On June 20, 2017, through counsel, Williams again requested a hearing on this motion, but the court declined, again indicating it would take no action. (Id. at 110–12).

On November 12, 2015, Williams initiated state postconviction proceedings under Maryland's Uniform Postconviction Procedure Act ("UPPA"), which he withdrew without prejudice on November 7, 2016. (Id. at 103–08, 109).

On June 5, 2020, Williams filed a second UPPA petition, (id. at 113–29), which he later supplemented, (id. at 132–75). The Circuit Court for Charles County held a postconviction hearing on August 3, 2022, after which it orally denied the petition. (Id. at 7, 176, 180). The postconviction court issued its written order on February 13, 2023. (Id. at 181).

Williams filed a timely application for leave to appeal the denial of postconviction relief, which was summarily denied on April 25, 2023 by the Appellate Court of Maryland. (Id. at 176–79, 182–83).

On May 8, 2023, this Court docketed Williams's federal habeas petition (the "Petition"). (ECF No. 1). The Petition is signed and dated April 17, 2023. (Habeas Pet. at 8, ECF No. 1). The stamp on the envelope indicating when the Petition was deposited in the institutional mail is illegible, however the envelope is post-marked May 3, 2023. (Envelope at 1, ECF No. 1-2).

In this Petition, Williams raises the following claims: (1) he was not advised of his right to waive a jury trial in favor of a bench trial; (2) trial counsel failed to challenge the warrantless use of a secret device to locate the target phone; (3) trial counsel failed to

6

object to the direct connect cellphone calls; and (4) the cumulative effect of multiple errors denied him a fair trial. (Habeas Pet. at 6).

On June 14, 2023, the Court directed Respondent to answer the Petition. (ECF No. 4). On June 27, 2023, Respondent filed a Limited Answer to the Petition arguing that the matter is time-barred. (Resp't's Ltd. Answer to Habeas Pet. ["Ltd. Answer"] at 12, ECF No. 6). On June 29, 2023, the Court issued an Order providing Williams twenty-eight days to respond to the Limited Answer and offer additional information concerning the timeliness of his Petition. (June 29, 2023 Order at 2–3, ECF No. 9).[5]

On the same day, Williams filed correspondence with the Court providing additional information he wished the Court to consider. (Pet'r's Correspondence re: Documents for Additional Consideration at 1–2, ECF No. 10). On July 7, 2023, the Court received Williams's Reply in support of his Petition. (ECF No. 11). On August 31, 2023, Williams filed correspondence with the Court providing additional case law in support of his Petition. (Pet'r's Correspondence re: Additional Case Law at 1–2, ECF No. 13). On July 31, 2024, Williams filed correspondence with the Court inquiring as to whether a hearing had been scheduled. (Pet'r's Correspondence re: Hearing at 1, ECF No. 14). On September 9, 2024, Williams filed a "Motion to court to File a Legal Memorandum in Support of Petition," (Pet'r's Mot. Suppl. Pet. at 1–4, ECF No. 15) and attached a "Brief"

---

[5] The Fourth Circuit has held that, before dismissing a pro se petition for writ of habeas corpus, "a district court should furnish notice that simply warns the pro se petitioner that his § 2254 action will be dismissed as untimely unless the petitioner can demonstrate that the petition was filed within the proper time period." Hill v. Braxton, 277 F.3d 701, 708 (4th Cir. 2002).

providing additional argument in support of the claims advanced in his Petition, (Br. Supp. Pet. at 1–3, ECF No. 15-1). Lastly, on October 18, 2024, Williams filed a "Supplement to Motion for court to File a Legal Memorandum in Support of Petition" providing "supporting case law" regarding his substantive claims. (2d Supp. Pet. at 1, ECF No. 16).

In his Reply, Williams generally asserts that he is entitled to equitable tolling. (Pet'r's Reply Supp. Pet. ["Reply"] at 3–4, ECF No. 11). He states that he properly filed his state postconviction petition within the ten-year statute of limitations under Maryland law and timely appealed the denial of relief. (Id. at 4). He asks, "that the courts take mercy on citizens and maintain a balance on the scale of punishment and pursuit of justice." (Id.)

## II.   DISCUSSION

### A.   Standard of Review

A one-year limitation period applies to petitions for writ of habeas corpus filed under 28 U.S.C. § 2254. The limitation period is set forth in 28 U.S.C. § 2244, which provides that the one-year limitation period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or

> claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). But "[t]he time during which a properly filed application for State postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). Further, the Fourth Circuit has held that a motion for modification of sentence filed under Maryland Rule 4-345 tolls the one-year limitations period under 28 U.S.C. § 2244(d)(2) because "a Maryland Rule 4-345 motion to reduce sentence is not part of the direct review process and undoubtedly calls for review of the sentence." Mitchell v. Green, 922 F.3d 187, 195 (4th Cir. 2019) (quoting Wall v. Kholi, 562 U.S. 545, 555 (2011)) (internal quotation marks omitted).

"[T]he one-year limitation period is also subject to equitable tolling in 'those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation against the party.'" Hill v. Braxton, 277 F.3d 701, 704 (4th Cir. 2002) (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)). To be entitled to equitable tolling under this theory, a petitioner must establish that either some wrongful conduct by respondents contributed to his delay in filing his petition or that "extraordinary circumstances" beyond his control "made it impossible to file the claims on time." See Harris, 209 F.3d at 330. "[A]ny resort to equity must be reserved for those rare instances where . . . it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Id.

9

B.   **Analysis**

Williams' conviction became final for purposes of calculating the one-year limitation period under § 2244(d)(1) on December 22, 2014, the day the ninety-day period for seeking certiorari review with the United States Supreme Court expired. See Jimenez v. Quarterman, 555 U.S. 113, 119 (2009).

Williams timely filed a Motion under Maryland Rule 4-345(e), and that motion tolled the limitations period while it was pending. Under Maryland law, the state court had revisory power over Williams' sentence for five years after the sentence was imposed. Williams was sentenced on January 29, 2013, and the circuit court retained revisory power over his sentence until January 29, 2018. Thus, Williams is entitled to statutory tolling of the limitations period until January 29, 2018. See Carey v. Saffold, 536 U.S. 214, 219–20 (2002) ("[A]n application is pending as long as the ordinary state collateral review process is 'in continuance'—i.e., 'until the completion of that process.'").

Williams had no other postconviction proceedings pending until he refiled his UPPA petition on June 5, 2020. But, by then, the one-year statute of limitations had expired. That postconviction petition could not toll the limitations period because it was filed well after the one-year limitations period expired. State proceedings filed after the federal habeas deadline has passed do not revive the limitations period. See Gray v. Waters, 26 F.Supp.2d 771, 772 (D.Md. 1998) (holding the limitations period "does not begin to run anew for a year following denial of state post-conviction remedies"); Sibley v. Culliver, 377 F.3d 1196, 1204 (11th Cir. 2004) (stating a state court filing after the federal deadline expired does not revive the federal limitations period); Smith v. McGinnis, 208 F.3d 13, 17

(2d Cir. 2000) (explaining that a state postconviction proceeding commenced after the one-year limitation period has already expired does not "reset" the start of the limitation period).

Williams' Petition does not rely on a constitutional right recognized by the Supreme Court which was made retroactively applicable, nor does Williams allege that he was prevented from filing his Petition through state action or that the factual predicate for any of his claims was not discovered until one year prior to the filing of his Petition. 28 U.S.C. § 2244(d)(1). Further, the Court does not find that Williams has presented any evidence that he is entitled to equitable tolling of the limitations period. "[E]ven in the case of an unrepresented prisoner, ignorance of the law is not a basis for equitable tolling." United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004). Consequently, the Petition must be denied as time-barred.

### III.   CERTIFICATE OF APPEALABILITY

When a district court dismisses a habeas petition solely on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" Rose v. Lee, 252 F.3d 676, 684 (4th Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). This Court concludes that Williams has not made such a showing and declines to issue a certificate of appealability. Williams may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. See Lyons v. Lee, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court

declined to issue one).

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Williams's Petition for Writ of Habeas Corpus (ECF No. 1) and decline to issue a certificate of appealability. A separate Order follows.

Entered this 12th day of November, 2024.

/s/
George L. Russell, III
Chief United States District Judge